## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **ABBOTT LABORATORIES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.** 1:13-cv-811-RWS |
| | ) | **JURY TRIAL DEMANDED** |
| **BOSTON SCIENTIFIC** | ) | |
| **CORPORATION and SAMUEL** | ) | |
| **CONAWAY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff Abbott Laboratories ("Abbott"), for its Verified Complaint for Injunctive Relief and Damages against Defendants Boston Scientific Corporation ("Boston Scientific") and Samuel Conaway ("Conaway"), alleges as follows:

### NATURE OF THE ACTION

1.     Current Boston Scientific employee, Samuel Conaway, is party to an enforceable agreement with his former employer, Abbott Laboratories, in which Conaway agreed, *inter alia*, not to directly or indirectly solicit or assist in soliciting certain Abbott employees.  Despite its full awareness of Conaway's contractual obligations to Abbott, Boston Scientific has intentionally and unjustifiably caused and is causing Conaway to breach those obligations and is acting in concert with

Conaway to actively solicit Abbott sales representatives in violation of Conaway's contractual obligations to Abbott.

2.     The malice and ill-will behind Boston Scientific's and Conaway's wrongful campaign was recently revealed to Abbott when a former Boston Scientific sales representative told an Abbott sales representative that Conaway (and thus Boston Scientific) is specifically targeting Abbott sales representatives with the goal of "crush[ing] Abbott."  That sales representative further revealed that shortly after arriving at Boston Scientific in January 2013, Conaway gave a speech on stage at a national sales conference hosted by Boston Scientific exclaiming that his (and thus Boston Scientific's) ultimate goal was to "kick Abbott's ass."

3.     To date, three Abbott sales representatives that Conaway came to know during his employment with Abbott already have announced their intent to leave Abbott for Boston Scientific as a result of Boston Scientific's and Conaway's unlawful tactics.  Furthermore, numerous additional Abbott coronary sales team members, most of whom reported up to Conaway while he was employed by Abbott, have been solicited by Boston Scientific since Conaway joined Boston Scientific in January 2013.  At least one of these Abbott sales representatives was

told specifically, by the Boston Scientific employee who attempted to solicit him, that Conaway had directed him to solicit that Abbott sales representative.

4.     Boston Scientific has refused Abbott's requests that it cease inducing Conaway to violate his Abbott contract.   Boston Scientific's and Conaway's actions have caused and continue to cause irreparable harm to Abbott.  As a result, Abbott is forced to seek injunctive and compensatory relief to protect its assets, operations, reputation, and goodwill against Boston Scientific's tortious interference with Conaway's contractual obligations to Abbott, as well as against Conaway's breach of his non-solicitation obligations to Abbott.

## THE PARTIES

5.     Abbott Laboratories is an Illinois corporation with its principal place of business in Abbott Park, Illinois.

6.     Upon information and belief, Boston Scientific Corporation is a Delaware corporation, with its principal place of business in Natick, Massachusetts.

7.     Samuel L. Conaway is an individual and is, upon information and belief, a resident of the State of Georgia.  Conaway is party to an Employee Agreement (the "Conaway Employee Agreement") with Abbott.

## RELEVANT NON-PARTIES

8.     James Watkins is an individual and is, upon information and belief, a resident of the State of Florida.  Watkins was employed by Abbott beginning in January 2009, and served as a Territory Manager in Florida for Abbott's Vascular Division until resigning in late February 2013.  Watkins gave notice of his resignation from Abbott on February 28, 2013, and informed Abbott that he was leaving to join the Boston Scientific division led by Conaway.

9.     Jamal Lewis is an individual and is, upon information and belief, a resident of the State of Minnesota.  Lewis was employed by Abbott beginning in February 2008, and served as a Territory Manager in Minnesota for Abbott's Vascular Division until resigning in late February 2013.  Lewis gave notice of his resignation from Abbott on February 28, 2013, and informed Abbott that he was leaving Abbott to join the Boston Scientific division led by Mr. Conaway.

10.    Chad Olberding is an individual and is, upon information and belief, a resident of the State of California. Olberding was employed by Abbott beginning in April 2008, and served as a Territory Manager in California for Abbott's Vascular Division until resigning in early March 2013.  Olberding gave notice of his resignation from Abbott on March 6, 2013, and informed Abbott that he was leaving to join the Boston Scientific division led by Conaway.

## JURISDICTION AND VENUE

11.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.  The threatened breach of and tortious interference with the Conaway Employee Agreement by Conaway and Boston Scientific will cause Abbott to suffer well in excess of $75,000 in lost profits and goodwill.

12.     This Court has personal jurisdiction over Boston Scientific because, upon information and belief, Boston Scientific is registered to do business in Georgia, its registered agent is located in Norcross, Gwinnett County, Georgia, in the Northern District, Atlanta Division, and Boston Scientific is in fact actually doing substantial business in this District.

13.     This Court has personal jurisdiction over Samuel Conaway because Conaway resides and works in Georgia and, on information and belief, in Atlanta, Dekalb County, Georgia, and in the Northern District, Atlanta Division.

14.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b), and in the Atlanta Division pursuant to LR 3.1, NDGa.

## FACTUAL BACKGROUND

**A.   CONAWAY'S EMPLOYMENT WITH AND CONTRACTUAL OBLIGATIONS TO ABBOTT**

15.    Conaway was employed by Abbott (or one of its predecessor companies) from July 30, 1990 to January 23, 2012.  Conaway worked within Abbott's Vascular Division throughout his employment with Abbott.

16.    On or about February 17, 2010, in connection with his promotion to the role as Division Vice President of Coronary and Endovascular U.S. Sales for Abbott Vascular, Conaway executed the Conaway Employee Agreement.

17.    Thereafter, from February 2010 until January 23, 2012, Conaway served as Abbott Vascular's Division Vice President of Coronary and Endovascular U.S. Sales for Abbott Vascular.

18.    In that role, Mr. Conaway's duties included among other things, managing and overseeing the coronary and endovascular sales teams, achieving sales targets and, establishing and implementing plans and strategies for achieving sales goals.

19.    As Division Vice President, Conaway was given access to and used Abbott Confidential Information, as defined in the Conaway Employee Agreement, including, but not limited to, knowledge regarding Abbott Vascular's coronary and

endovascular sales forces, such as their performance and other information regarding their value as sales representatives.

20.     In the Conaway Employee Agreement, Conaway agreed, *inter alia*, that he was "engaged by ABBOTT in a position of trust and confidence in which [he would] use, observe, obtain or have access to Confidential Information" as defined in the Conaway Employee Agreement.

21.     Conaway further agreed, in Section 8 of the Conaway Employee Agreement, that he would not, "during the term of employment with ABBOTT or thereafter, use or disclose, or assist in the disclosure to others, directly or indirectly, any Confidential Information, except as required and authorized in the scope of [his] job responsibilities and in the furtherance of ABBOTT's business."

22.     Upon information and belief, Conaway's execution of the Conaway Employee Agreement was knowing, voluntary, willful, and informed.

23.     The Conaway Employee Agreement was supported by adequate consideration.

24.     Conaway further agreed to a two-year non-solicitation provision, set forth in Section 12 of the Conaway Employee Agreement as follows:

> EMPLOYEE shall not, during the term of employment with ABBOTT or for a period of two years after termination of employment with ABBOTT, directly or indirectly, for the benefit of EMPLOYEE or others,

solicit or assist in soliciting to work as an employee, independent contractor, partner, or otherwise, any employee of ABBOTT about whom EMPLOYEE acquired knowledge through EMPLOYEE's employment with ABBOTT.

25.     The Conaway Employee Agreement further provided in Section 15 thereto:

For a period of two years after termination of employment with ABBOTT, EMPLOYEE shall communicate EMPLOYEE's obligations under this Agreement to each subsequent employer(s), including providing to each subsequent employer(s) a copy of this Agreement, and shall advise ABBOTT of the name and address of EMPLOYEE's intended future employer. ABBOTT shall have the right to advise any subsequent employer of EMPLOYEE's obligations hereunder.

26.     The Conaway Employee Agreement further provided in Section 17 thereto:

This Agreement shall be construed, and its enforceability and the relationship of the parties shall be determined, in all respects under the laws of Illinois, without giving effect to conflict of law.

27.     Conaway left Abbott effective January 23, 2012, and, in conjunction with his separation from Abbott, signed a letter on February 20, 2012, which set forth an agreement between Abbott and Conaway regarding his separation ("Conaway Separation Agreement").

28.   In the Conaway Separation Agreement, paragraph 12, Conaway agreed:

> You hereby reaffirm your continuing obligations under your Abbott Employee Agreement, specifically including but not limited to paragraph 12 of that agreement, which provides that you shall not, during the term of your employment with Abbott or for a period of two years after termination of your employment with Abbott, directly or indirectly, for the benefit of yourself or others, solicit or assist in soliciting to work as an employee, independent contractor, partner, or otherwise, any employee of Abbott about whom you acquired knowledge through your employment with Abbott.

29.   The Conaway Separation Agreement, in the closing paragraph, specifically provided that "nothing in this agreement supersedes the terms of your Employee Agreement."

30.   Upon information and belief, Conaway's execution of the Conaway Separation Agreement was knowing, voluntary, willful, and informed.

31.   Abbott has fully performed all of its obligations to Conaway under the Conaway Employee Agreement and the Conaway Separation Agreement.

32.   The Conaway Employee Agreement and the Conaway Separation Agreement are reasonable in scope and duration and are not more extensive than is reasonable and necessary for Abbott to protect its legitimate business interests, including, but not limited to: its confidential information; trade secrets; goodwill; near-permanent customer relationships; and its interest in maintaining a stable

workforce of coronary sales representatives, particularly given their specialized skills, strong relationships with long-time customers, the limited number of competitors in the highly specialized and competitive market for skilled coronary sales representatives, and the limited pool of competent replacements.

33.    Indeed, Abbott spends years and countless resources recruiting, hiring, training, and developing coronary sales representatives.  For example, when an individual is hired as a coronary or endovascular sales representative, he or she must undergo an initial training program over the course of a year that includes "in class", field training and "advanced" training.  The various stages of the training cover such topics as product knowledge, corporate compliance, understanding competitor products, positioning Abbott's on-label products in the market to compete with competitors' products, profiling accounts, formulating marketing and business strategies based on Abbott's goals and priorities, negotiating contracts and pricing, analyzing their territories and establishing business plans based upon that analysis.

34.    Abbott expends significant resources to continue training its coronary and endovascular sales forces even after the completion of initial training.  For example, twice a year, the company gathers all sales personnel in a single location for its National Sales Meeting and Mid-Year Meeting.  It also holds regional sales

meetings throughout each year and further requires sales representatives to participate in training modules on various topics numerous more times per year.

35.     Abbott invests such time, effort and money in developing and training its sales representatives, in order to put them in the best position to build the confidence and trust necessary to maintain and foster the customer relationships that are so critical to the sales representatives' success in a highly competitive market.  As a result of these efforts, Abbott Vascular's coronary and endovascular sales representatives are able to maintain Abbott's pre-existing long-term relationships with the customer base of physicians and hospitals they serve.

36.     Abbott's sales force is also provided access to Abbott's sensitive, confidential, and proprietary business information, including reports of revenues generated by sales territories with respect to Abbott coronary or endovascular products; customer information and negotiations; market research, specifically with respect to coronary or endovascular product lines; short- and long-term sales strategies for their territories; implementing strategies on product launches; strategic marketing and sales plans; and pricing strategies and information.  In particular, some of the departing employees at issue here, forwarded such information from Abbott's servers to their personal email addresses shortly before departing the company.

37.   In light of these efforts, expenditures of resources, their critical importance in allowing Abbott to compete in the highly competitive market-place for coronary and endovascular devices, and their possession of sensitive, confidential, and proprietary business information, Abbott has a compelling interest in protecting its investment in and maintaining a stable force of skilled coronary sales representatives, as well as protecting its confidential and proprietary business information.

**B.   WATKINS'S EMPLOYMENT WITH ABBOTT**

38.   James Watkins resigned his employment as a coronary Territory Manager in Florida for Abbott's Vascular Division on February 28, 2013.  Abbott is paying him through March 13, 2013.  Upon information and belief, he will be joining Boston Scientific in the same or similar role to the one he held at Abbott.

39.   As a Territory Manager for Abbott's Vascular Division, Watkins was responsible for, had access to and/or provided input into Abbott confidential information by regularly reviewing reports of revenues generated by sales territories with respect to Abbott coronary products; negotiating contracts with external customers; regularly monitoring the market activities of Abbott's competitors, specifically with respect to coronary product lines; preparing short- and long-term strategies regarding which doctors Abbott would target in their

territories; implementing strategies on product launches; maintaining relationships with customers, formulating the strategic marketing and sales plans, focusing on the best way to market and position Abbott's products to maximize Abbott's share of the market; and providing input into pricing strategies for their territories.

40.    As a Territory Manager for Abbott's Vascular Division, Watkins was also given access to and helped maintain Abbott's pre-existing long-term relationships with customers in his territory that he would not have had but-for his employment with Abbott.

## C.    LEWIS'S EMPLOYMENT WITH ABBOTT

41.    Jamal Lewis resigned his employment as a coronary Territory Manager in Minnesota for Abbott's Vascular Division on February 28, 2013. Abbott is paying him through March 13, 2013.  Upon information and belief, he will be joining Boston Scientific in the same or similar role to the one he held at Abbott.

42.    As a Territory Manager for Abbott's Vascular Division, Lewis was responsible for, had access to and/or provided input into Abbott confidential information by regularly reviewing reports of revenues generated by sales territories with respect to Abbott coronary products; negotiating contracts with external customers; regularly monitoring the market activities of Abbott's

competitors, specifically with respect to coronary product lines; preparing short- and long-term strategies regarding which doctors Abbott would target in their territories; implementing strategies on product launches; maintaining relationships with customers, formulating the strategic marketing and sales plans, focusing on the best way to market and position Abbott's products to maximize Abbott's share of the market; and providing input into pricing strategies for their territories.

43.    As a Territory Manager for Abbott's Vascular Division, Lewis was given access to and helped maintain for Abbott pre-existing long-term relationships with customers in his territory that he would not have had but-for his employment with Abbott.

### E. CHAD OLBERDING'S EMPLOYMENT WITH ABBOTT

44.    Chad Olberding resigned his position as a coronary Territory Manager in California for Abbott's Vascular Division on March 6, 2013.  Abbott is paying Olberding through March 20, 2013.  Upon information and belief, he will be joining Boston Scientific in the same or similar role to the one he held at Abbott.

45.    As a Territory Manager for Abbott's Vascular Division, Olberding was responsible for, had access to and/or provided input into Abbott confidential information by regularly reviewing reports of revenues generated by sales territories with respect to Abbott coronary products; negotiating contracts with

external customers; regularly monitoring the market activities of Abbott's competitors, specifically with respect to coronary product lines; preparing short- and long-term strategies regarding which doctors Abbott would target in their territories; implementing strategies on product launches; maintaining relationships with customers, formulating the strategic marketing and sales plans, focusing on the best way to market and position Abbott's products to maximize Abbott's share of the market; and providing input into pricing strategies for their territories.

46.     As a Territory Manager for Abbott's Vascular Division, Olberding was given access to and helped maintain for Abbott pre-existing long-term relationships with customers in his territory that he would not have had but-for his employment with Abbott.

## F.   BOSTON SCIENTIFIC AND CONAWAY ACT IN CONCERT TO VIOLATE CONAWAY'S NON-SOLICITATION OBLIGATIONS

47.     Conaway was hired by Boston Scientific, effective January 7, 2013, for the role of Vice President, CTO Sales and Strategic Accounts.

48.     On January 8, 2013, Abbott sent Boston Scientific a letter informing Boston Scientific of Conaway's non-solicitation obligations under the Conaway Employee Agreement, and included a copy of the agreement with its letter.

49.     Within days of Conaway's departure, at least a half dozen Abbott sales representatives about whom Conaway had acquired knowledge while at

Abbott were solicited to join Boston Scientific by either Boston Scientific or Conaway.

50.     In or about the end of January, 2013, Boston Scientific coronary sales director Paul Pharris contacted Daniel Lewis, Abbott's Territory Manager for the Southwest Texas region, by telephone.

51.     During the conversation, Pharris told Lewis that "Sam Conaway told me to give you a call" and that Boston Scientific was going after "select" Abbott sales representatives in an effort to build a sales force, and encouraged Lewis to apply to Boston Scientific.

52.     During the same conversation, Pharris also told Lewis that Conaway could not speak with Lewis directly because of his contractual obligations to Abbott, but that Kugler would be speaking directly with Lewis.

53.     After the conversation with Pharris, Lewis reported the call to his supervisor.

54.     Subsequently, on February 20, 2013, Boston Scientific Sales Representative Chad Foy – with whom Lewis had had prior dealings – called Lewis and reported to him that he (Foy) had been told not to contact Lewis because Lewis had supposedly gone to Abbott corporate compliance regarding solicitation contacts by Boston Scientific.

55.     Foy further asked for and arranged that he and Lewis meet in-person that Friday, April 22.

56.     During the Friday April 22 in-person meeting, Foy reported the following to Lewis:

      a.  That Conaway wanted to go out and take away top Abbott sales representatives, in an effort to "crush Abbott";

      b.  That Conaway was specifically targeting Abbott sales representatives; and

      c.  That Conaway had stated, on-stage at a Boston Scientific national sales force meeting in mid-January 2013 that his ultimate goal was "to kick Abbott's ass."

57.     Numerous other solicitations of Abbott employees took place within days of Conaway having joined Boston Scientific.  For example, Chad Kugler of Boston Scientific, called Mike LoVuolo, Abbott's Executive Territory Manager for the Massachusetts Region, and attempted to solicit LoVuolo to join Boston Scientific.  The timing of the call in relation to the commencement of Conaway's employment with Boston Scientific was even suspicious to LoVuolo, who commented to Kugler regarding the "more than coincidental" timing of the call.

Kugler ignored LoVuolo's comment. Several weeks later, in February 2013, Conaway himself attempted on more than one occasion to reach LoVuolo directly.

58.    Likewise, within days of Conaway having joined Boston Scientific, Kugler telephoned Brittany Cohill, Abbott's Territory Manager for the Southwest Florida Region, and attempted to solicit her to join Boston Scientific. Kugler stated that Cohill's name had come up as a "strong candidate." Cohill specifically asked Kugler whether Sam Conaway had recommended her. Kugler did not answer Cohill's question directly, but instead responded only by repeating that Cohill's name had come up as a strong candidate.

59.    Moreover, on January 10, 2013 – three days after Conaway's arrival at Boston Scientific – Kugler left a message for Thomas Fenton, Abbott's Territory Manager for the San Francisco bay area, stating that he wanted to talk to Fenton about an opportunity at Boston Scientific.

60.    In addition to the foregoing unsuccessful solicitation attempts, Boston Scientific and Conaway, acting in concert and in violation of Conaway's non-solicitation obligations, have successfully recruited away three Abbott Territory Managers, James Watkins, Jamal Lewis and Chad Olberding.

61.    Conaway acquired knowledge of each of the foregoing Abbott sales representatives during his employment with Abbott.

62.     Upon information and belief, Conaway's and Boston Scientific's improper solicitation of Abbott coronary sales representatives is ongoing.

63.     The continued improper solicitation of Abbott's sales representatives by Conaway and Boston Scientific puts Abbott's legitimate protectable interests at grave risk, including its confidential information, trade secrets, goodwill, near-permanent customer relationships, and its investment in and interest in maintaining a stable workforce of coronary sales representatives.

64.     The continued improper solicitation of Abbott's sales representatives by Conaway and Boston Scientific has caused and will continue to cause irreparable harm for which no adequate remedy at law exists.

## CLAIMS FOR RELIEF

### COUNT I:
### BREACH OF CONTRACT – CONAWAY EMPLOYEE AGREEMENT
(AGAINST CONAWAY ONLY)

65.     Abbott re-alleges and restates the foregoing paragraphs as if fully restated herein.

66.     Section 12 of the Conaway Employee Agreement is a valid and enforceable contractual provision entered into by Abbott and Conaway in exchange for good and valuable consideration.

67.    Section 12 of the Conaway Employee Agreement is reasonable in duration and scope.

68.    Abbott has fully performed every obligation it owes to Conaway under the Conaway Employee Agreement.

69.    Conaway has breached the Conaway Employee Agreement by taking part in the solicitation of current Abbott employees about whom he acquired knowledge through his employment with Abbott.

70.    Abbott has suffered, and will continue to suffer, damages as a result of this breach.

71.    Unless Conaway is preliminarily and permanently enjoined from violating the terms of the Conaway Employee Agreement, Abbott will be irreparably harmed.  No adequate remedy at law exists for this breach.

### COUNT II:
### TORTIOUS INTERFERENCE WITH CONTRACT – CONAWAY EMPLOYEE AGREEMENT
(AGAINST BOSTON SCIENTIFIC ONLY)

72.    Abbott re-alleges and restates the foregoing paragraphs as if fully restated herein.

73.    Sections 12 of the Conaway Employee Agreement is a valid and enforceable contractual provision entered into in exchange for good and valuable consideration.

74.    Abbott has fully performed every obligation it owes to Conaway under the Conaway Employee Agreement to date.

75.    Boston Scientific is and was at all relevant times aware of the Conaway Employee Agreement and Conaway's obligations thereunder.

76.    Boston Scientific intentionally and unjustifiably induced Conaway to breach the Conaway Employee Agreement by, among other things, acting in concert with Conaway to solicit and/or attempt to solicit Abbott employees about whom Conaway acquired knowledge through his employment with Abbott, motivated by a desire to "crush Abbott" and to "kick Abbott's ass."

77.    Boston Scientific acted improperly and without privilege, purposely and with malice with the intent to injure.  Boston Scientific's actions interfered with Abbott's existing contractual rights and relations with Conaway.

78.    As a result of Boston Scientific's tortious interference and inducement, Conaway has breached the Agreement by soliciting and/or attempting to solicit current Abbott employees about whom Conaway acquired knowledge through Conaway's employment with Abbott.

79.    Boston Scientific's interference with Conaway's contractual obligations was intentional, willful and malicious.

80.     Upon information and belief, Boston Scientific actively persuaded, encouraged, and/or incited Conaway to breach his contractual obligations to Abbott.

81.     Upon information and belief, Boston Scientific was motivated by a desire to interfere with Abbott's contractual relations with its former employees and a desire to injure Abbott.

82.     As a result, Abbott has suffered, and will continue to suffer, damages.

83.     Unless Boston Scientific is preliminarily and permanently enjoined from tortiously interfering with the Agreement, Abbott will be irreparably harmed. No adequate remedy at law exists for this breach.

### COUNT III:
### BREACH OF CONTRACT – CONAWAY SEPARATION AGREEMENT
(AGAINST CONAWAY ONLY)

84.     Abbott re-alleges and restates the foregoing paragraphs as if fully restated herein.

85.     Paragraph 12 of the Conaway Separation Agreement is a valid and enforceable contractual provision entered into by Abbott and Conaway in exchange for good and valuable consideration.

86.     Paragraph 12 of the Conaway Separation Agreement is reasonable in duration and scope.

87.   Abbott has fully performed every obligation it owes to Conaway under the Conaway Separation Agreement.

88.   Conaway has breached the Conaway Separation Agreement by taking part in the solicitation of current Abbott employees about whom he acquired knowledge through his employment with Abbott.

89.   Abbott has suffered, and will continue to suffer, damages as a result of this breach.

90.   Unless Conaway is preliminarily and permanently enjoined from violating the terms of the Conaway Separation Agreement, Abbott will be irreparably harmed.  No adequate remedy at law exists for this breach.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Abbott Laboratories respectfully requests that this Court:

(i)   Enjoin Defendant Boston Scientific Corporation, its officers, agents, servants, employees, and attorneys, and those acting in concert with them, from aiding or abetting or causing Samuel Conaway to violate the contractual obligations he owes to Abbott as contained in the Conaway Employee Agreement and/or the Conaway Separation Agreement with Abbott, including his non-solicitation obligations;

(ii)    Enjoin Defendant Conaway, his agents, servants, employees, and attorneys, and those acting in concert with them, from breaching his contractual obligations to Abbott as contained in the Conaway Employee Agreement and/or the Conaway Separation Agreement, including his non-solicitation obligations;

(iv)    Award Abbott compensatory, incidental, consequential, and punitive damages in an amount to be determined at trial;

(v)    Award Abbott its costs and expenses, including attorneys' fees and costs; and

(vi)    Grant Abbott such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Abbott hereby demands a jury trial on all issues so triable.

Respectfully submitted this 13th day of March, 2013.

By:    /s/ Nancy E. Rafuse
Nancy E. Rafuse
Georgia State Bar No. 621717
Joseph Sharp
Georgia State Bar No. 637965
ASHE RAFUSE & HILL LLP
1355 Peachtree Street, N.E., Suite 500
Atlanta, GA 30309
Tel: (404) 253-6002
Fax: (404) 253-6060
nancyrafuse@AsheRafuse.com

Eric M.D. Zion
Georgia State Bar No. 785901
WINSTON & STRAWN LLP
100 North Tryon Street, Suite 2900
Charlotte, NC 28202
Tel: (704) 350-7713
Fax: (704) 350-7800
ezion@winston.com

James F. Hurst
Joseph J. Torres
Cardelle B. Spangler
*Pro Hac Vice applications forthcoming*
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
Tel: (312) 558-5600
Fax: (312) 558-5700
jhurst@winston.com
jtorres@winston.com
cspangler@winston.com

*Attorneys for Abbott Laboratories*